## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **RENEE H. HALE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 14-cv-3137** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### OPINION

**SUE E. MYERSCOUGH, U.S. DISTRICT JUDGE:**

Plaintiff Renee H. Hale appeals from the denial of her application for Social Security Disability Insurance Benefits (DIB) and Supplemental Security Income Disability benefits (SSI) under Titles II and XVI of the Social Security Act (collectively Disability Benefits).  42 U.S.C. §§ 416(i), 423, 1381a, and 1382c.  This appeal is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  Hale has filed an Amended Motion for Summary Judgment (d/e 11), and Defendant Commissioner of Social Security has filed a Motion for Summary Affirmance (d/e 16).  For the reasons set forth below, the

Decision of the Commissioner is REVERSED and REMANDED for further proceedings.

### **STATEMENT OF FACTS**

Hale was born on August 16, 1953.  She completed the 11th grade.  She previously worked as a cashier, legislative assistant, receptionist, and office manager.  Certified Transcript of Proceedings before the Social Security Administration (d/e 8) (R.), 32, 103, 166.  She last worked on July 10, 2011.  R. 15, 32.  On July 18, 2011, Hale applied for Disability Benefits.  She alleged that she became disabled on January 31, 2010.  She subsequently amended her alleged onset date to July 1, 2011.  Hale suffered from peripheral vascular disease and chronic pulmonary insufficiency. R. 11, 13.  She also had a history of high blood pressure, high cholesterol, carpal tunnel syndrome, transient ischemic attacks (TIAs) or small strokes, coronary artery disease, blockages in the carotid arteries, and side effects from her medication.  R. 253, 259, 261, 392-96.

On January 9, 2010, Hale went to an urgent care facility in Gulfport, Mississippi.  At that time, she was 5 feet 11 inches tall and weighed 149 pounds.  Her blood pressure was 170/120.  She

was diagnosed with high blood pressure and given clonidine to lower her blood pressure. Her pressure dropped to 158/105. Her medication was adjusted and she was advised to go home and rest. R. 245-46.

On January 17, 2010, Hale returned to the urgent care facility for a follow-up examination. She reported at that time that she smoked approximately 48 packs of cigarettes per year. On examination, Hale's high blood pressure was improved, but not controlled. More medication was prescribed. R. 243.

On July 28, 2010, Hale went to the emergency room at St. John's Hospital, in Springfield, Illinois, complaining of left arm and leg weakness. She also reported that she could not speak. She also reported some facial drooping. R. 261, 366.

On August 2, 2010, Hale went to see Dr. Timothy Drake, M.D.[1] Hale reported visual disturbances, numbness in her left hand, weight loss, and feeling "disconnected." R. 366. She weighed 132 pounds at the visit. R. 367. Dr. Drake stated that the results of a CT scan of her brain taken on July 28, 2010, at the emergency

---

[1] Hale refers to Dr. Drake as Dr. David Drake in her memorandum. Brief In Support of Summary Judgment (d/e 12), at 1. The medical records list his name as Timothy Drake. See e.g., R. 368. Hale testified that his name was Timothy Drake. R. 40. The Court uses the name Timothy Drake.

room were normal.  Dr. Drake diagnosed benign essential hypertension, hypokalemia, and abnormal weight loss.  R. 366.  Dr. Drake noted that her neurologic symptoms could have been caused by low potassium levels as a side effect of her medications.  R. 367.

On August 31, 2010, Hale went to see Dr. Drake, complaining of difficulty controlling her left hand and "strange sensations in her left leg."  R. 360.  She also reported some numbness in her face and difficulty speaking.  Hale reported that she was still smoking.  She weighed 131 pounds.  Dr. Drake diagnosed TIAs and ordered an MRI of her brain.  R. 360-61.

On September 2, 2010, an MRI of Hale's brain showed several small areas which indicated dead tissue, and some white matter abnormalities that indicated a blood supply problem.  R. 358.  The radiologist, Dr. Craig Russo, M.D., opined that the findings raised the possibility of stenosis of her right middle cerebral artery or her right internal carotid artery.  R. 359.

On September 3, 2010, Hale saw a surgeon, Dr. Stephen Ryan, M.D.   Dr. Ryan stated that a carotid duplex study conducted on September 2, 2010, showed a greater than 70 % stenosis her right internal carotid artery R. 261.  Hale was diagnosed with

carotid artery stenosis with cerebral infarction.  The stenosis in the right internal carotid artery was severe.  R. 261-62.  She was also diagnosed with multiple recent strokes.  R. 253, 261.  Dr. Ryan recommended a carotid endarterectomy, a surgical procedure to remove plaque from the right carotid artery.  R. 253.[2]

On September 9, 2010, Hale underwent the recommended surgery to remove plaque from the right carotid artery.  Dr. Ryan also inserted a stent into the right carotid artery.  R. 256.  Dr. Ryan noted that her "postoperative course was largely unremarkable," and her medications controlled her blood pressure.  R. 253.  She was discharged on September 10, 2010.  R. 253.

On December 3, 2010, Hale saw Laura Amidon, a health care professional working under the supervision of Dr. Drake.[3]  Hale reported pain in her left arm and tingling in the fingertips of her left hand.  Hale reported waking up at night with numbness in both hands.  On examination, Tinel's sign was positive in both hands, but Phalen's sign was negative.[4]  Amidon diagnosed probable carpal

---

[2] See Commissioner's Memorandum in Support of Motion for Summary Affirmance (d/e 17), at 4 n. 3.
[3] The records do not indicate Amidon's professional credentials.
[4] Tinel's sign for possible carpal tunnel syndrome is determined by tapping the center of the wrist with the palm facing upward.  A positive sign will result in tingling in the hand.  Phalen's sign for carpal tunnel syndrome is determined holding the affected hand with the wrist fully flexed or extended for thirty to sixty

tunnel syndrome.  Amidon recommended wrist splints and ibuprofen.  R. 345.

On May 10, 2011, Hale saw Dr. Drake.  R. 339-40.  Hale complained of weight loss and pain in her thoracic spine when she was on her feet at work.  Hale reported that she worked six-hour shifts as a cashier at Dollar General.  Hale weighed 122 pounds at the time of the visit.  Hale also reported that she had never had a colonoscopy performed.  Dr. Drake recommended health screening tests, including a colonoscopy.  R. 340.

On June 30, 2011, Hale saw Dr. Drake for a follow-up examination after she had the recommended colonoscopy.  Dr. Drake noted that Hale's blood pressure was still elevated and she had no appetite.  Hale reported that she still smoked.  Hale reported that she became dizzy and short of breath when she lifted her arms above her head to adjust items on the shelves at the Dollar General while at work.  She also reported continued problems with weight loss.  Hale weighed 117 pounds at this visit.  Dr. Drake noted that Hale's blood pressure was better controlled.  He continued her blood pressure medications.  R. 312-13.

---

seconds.  A positive sign will result in the hand becoming numb.  Dorland's Illustrated Medical Dictionary (32$^d$ ed. 2012) (Dorland's), at 1716, 1896

On July 15, 2011, Hale underwent a stress test.  The stated reason for the test was possible shortness of breath.  The results were negative except for found a small amount of thinning of her arterial walls.  R. 288.  On July 28, 2011, Dr. Lara Dennis, M.D., interpreted the test results and diagnosed ectasia, or dilation, of the abdominal aorta and atherosclerotic changes.  R. 289. See Dorland's, at 591.

On August 11, 2011, Hale saw Dr. Drake.  Dr. Drake described Hale's cardiac workup as "unremarkable."  R. 310.  Hale reported an inability to gain weight and "episodes . . . when she does not feel well; she feels woozy, blood pressure will go up."  R. 310.  Hale reported that she could not work because she was too tired.  Hale weighed 117 pounds at this visit.  On examination, Dr. Drake concluded that Hale appeared pretty stable, but her weight loss was not explained.  Dr. Drake stated that Hale's fatigue could be related to her medications.  Dr. Drake completed a form for her absence from work.  He stated that she was "unable to work because she is just basically too tired." R. 311.

On September 16, 2011, the Social Security Administration made initial determinations to deny Hale's claims for Disability

Benefits.  The initial determinations referred to a Dr. Ernst Chester
Bone, M.D., and noted in the box for physician or medical specialist
signature, "See 4743 dated 09/14/11."  R. 63, 64.  The record
contains no reports or opinions from Dr. Bone.  The record also
contains no document dated September 14, 2011.  The Social
Security Administration's Physical Residual Functional Capacity
(RFC) Assessment form is identified as form SSA-4734-BK.  See
Occupational Information Development Advisory Panel Content
Model and Classification Recommendations, Appendix G, Relevant
Regulations and Social Security Rulings, at G-2, available at
http://www.socialsecurity.gov/oidap/Documents/AppendixG.pdf,
viewed July 6, 2015.[5]  The record contains no RFC Assessment
form.

On November 17, 2011, Hale saw Dr. Drake.  Hale reported
some pulling in her carotid area.  Hale reported that she has not
been working and "she believes that it's helping a lot."  R. 372.
Hale reported a slight increase in appetite, a more consistent blood
pressure throughout the day, and feeling better overall.  R. 371-72.

---

[5] Courts may consider available public information in rendering decisions.  See Belleville Catering Co. v.
Champaign Market Place, LLC, 350 F.3d 691, 693 (7th Cir. 2003) ("Counsel could have done what the
court did: use the Internet.").

Dr. Drake discounted the neck sensation because the stress test was largely normal.  Dr. Drake assessed side effects from long-term medications, benign essential hypertension, and hypercholesterolemia.  R. 373.  Hale weighed 121.5 pounds, with a BMI index of 17.2.  R. 372.  Dr. Drake noted that Hale appeared "better" and her blood pressure was "fairly well controlled."  R. 373.

On December 5, 2011, Hale saw Dr. Drake.  Hale wanted to talk about disability.  She also complained about an episode of right-side chest pain, radiating to the left.  She had difficulty breathing during the episode.  The episode lasted 90 seconds.  R. 376.  Hale also reported that she could not work because of "overall general fatigue;" "ongoing discomfort in her left knee," which often became swollen; chronic back pain; an inability to sit or stand for prolonged periods of time; dizziness related to blood pressure medications; carpal tunnel syndrome; history of carotid artery stenosis; and past TIAs.  R. 376.  Dr. Drake diagnosed her with chest pain and ordered diagnostic testing.  R. 377.  Dr. Drake opined:

> Regarding her question of disability, I do think she has multiple chronic medical conditions which would make it impossible for her to work on a regular continuing basis

8 hours per day and 5 days a week.  These conditions
include dizziness related to her medications, overall
general deconditioning, degenerative arthritis, and carpal
tunnel syndrome.  For that matter, I do not feel that she
would be able to work on a part-time basis, again on a
regular continuing schedule.

R. 377.

On December 5, 2011, Dr. Drake wrote a letter To Whom It

May Concern, in which he stated:

Renee Hale, date of birth August 16, 1953, is currently
under my medical care.  She is applying for disability.
Her most recent job was a part time cashier at Dollar
General.  She had multiple medical problems which
forced her to quit her job in June 2011.  She continues to
have multiple medical problems which limit her ability to
work.  These include poorly controlled hypertension,
adverse side effects to her antihypertensive regimen,
general deconditioning, carpal tunnel syndrome, as well
as degenerative arthritis.  She has a prior history of
transient ischemic attack secondary to coronary artery
stenosis.

In my opinion she is unable to work on a regular,
continuing basis for 8 hours per day and 5 days a week.
I also feel it would be very difficult for her to work on a
part time schedule. . . .

For purposes of privacy compliance, this document is
released to the patient for review, approval, and
forwarding to the intended receiver.

R. 378.

On January 19, 2012, state agency physician Dr. Reynoldo Gotanco, M.D., reaffirmed the RFC assessment dated September 14, 2011. R. 379-81. The record contains no document dated September 14, 2011, and contains no RFC Assessment form. Dr. Gotanco noted that Hale was "denied and restricted to light duty activities at the initial assessment." Dr. Gotanco gave Dr. Drake's December 5, 2011, opinions "some weight but not full weight due to vocational factors beyond attending understanding." Dr. Gotanco concluded that Hale "complains/alleges further pain since the initial assessment, however based on the overall objective findings from the initial and this reconsideration assessment; the claimant is partially credible." R. 381.

On January 20, 2012, the Social Security Administration denied Hale's claims for Disability Benefits on reconsideration. The denials referred to Dr. Gotanco's opinions. R. 65-66.

On May 21, 2012, Hale saw Dr. Drake. Hale complained of weakness in her left leg, numbness in both feet, intermittent vision loss in her left eye, and dizziness. R. 381. Dr. Drake noted elevated blood pressure. Dr. Drake diagnosed Hale with TIAs and amaurosis

fugax.[6]  R. 383.  Dr. Drake noted concerns about neurological symptoms.  He ordered a number of tests, including an echocardiogram and several CT scans.  R. 383.  Dr. Wallace Anderson, M.D., interpreted a CT scan of Hale's chest and diagnosed her with emphysema, indeterminate noncalcified pulmonary nodules, coronary artery disease, ectasia of the ascending aorta without aneurysm, and centrilobular emphysema. R. 392-93.  Dr. Joseph Basler, M.D. interpreted a CT scan of Hale's head and diagnosed atheromatous calcifications in the distal vertebral arteries, atheromatous calcifications in the intercavernous internal carotid arteries, left greater than right.  R. 394.[7]  Dr. Basler interpreted a CT scan of Hale's neck and diagnosed emphysema, diffuse vertebral artery atheromatous changes, patulous bifurcation region right carotid artery, and approximately 50% narrowing in the bifurcation region of the left common carotid artery.  R. 396.

On December 7, 2012, Hale saw Dr. Asha Alex, M.D.  Hale complained of problems with her back, her joints, and her hands. At that time, Hale's blood pressure was under good control.  Dr.

---

[6] Loss of vision in one eye due to lack of blood flow.  Commissioner's Memorandum of Law in Support of Motion for Summary Judgment (d/e 17), at 6 n.4.
[7] Atheromatous means affected by or in the nature of a mass of plaque occurring in atherosclerosis.  See Dorland's, at 172.

Alex advised Hale to quit smoking.  R. 402-03.   On examination, Tinel's sign was negative.  R. 402.  X-rays of her back showed degenerative changes with disk narrowing, osteophyte formation, and facet hypertrophy at L4-L5 and L5-S1 levels.  R. 409.

On February 1, 2012, Hale saw Dr. Joanna Rea, M.D.  Hale weighed 127.3 pounds at the time of the visit.  Hale reported issues with depression and anxiety.  Dr. Rea diagnosed adjustment disorder with mixed anxiety and depressed mood.  Dr. Rea prescribed antidepressants.  Dr. Rea also recommended stopping smoking.  Hale reported that she was doing better with her smoking.  She reported smoking one pack a week.  R. 422-24.

On February 15, 2013, the manager of the store where Hale worked as a cashier wrote a letter.  He stated, in part,

> [I] observed Ranae (sic) while she was working that she
> had dizzy spells, and nausea.  Ranae had a lot of back
> pain, which . . . affected . . . mobility to work Ranae Hale
> was a good worker, tried very hard but medical issues
> disabled her to work

R. 230.

On February 15, 2013, the Administrative Law Judge (ALJ) held an evidentiary hearing by videoconference.  R. 25-62.  The ALJ conducted the hearing from Peoria, Illinois.  Hale appeared in

person and with her attorney by videoconference from Springfield, Illinois; and vocational expert Dr. James Lanier appeared by videoconference from Springfield.  R. 11, 27.

Hale testified first.  Hale testified that she was 5 feet 10 ¾ inches tall, and weighed 122 pounds.  Hales testified that she lost fifteen to twenty pounds in the last year.  She testified that her normal weight had been 155 to 160 pounds, and she had lost a total of about 40 pounds since 2010.  R. 29.  Hale testified that she weighed 115 pounds when she had her carotid endarterectomy surgery in September 2010.  R. 44.  Hale testified that she was separated from her husband and lived with a roommate in a single-story house.  R. 29.

Hale testified that she completed the eleventh grade.  She last worked in July 2011.  She worked part-time, twenty to twenty-five hours per week, as a cashier at a Dollar General store.  R. 32.  In addition to operating the cash register, Hale stocked shelves, directed customers to the location of products in the store, swept and mopped the store, and cleaned the bathrooms.  R. 36-37.

Hale testified that she stopped working because, "I just wasn't able to – I had a lot of trouble standing for any long periods of time,

a lot of trouble with nausea and dizziness and concentrating on running the register and making change, doing that quickly. It became very hard for me." R. 33. Hale testified that she was required to lift heavy bags of dog food and cases of detergent and other products to stock the shelves. She testified that she could not lift these items shortly before she quit. She testified that she became extremely dizzy and short of breath. R. 37. Hale testified that she had difficulty concentrating at the register. She testified that she had to concentrate to scan products accurately without double scanning or not scanning products. She also had trouble making change. She also testified that she had a lot of back pain from prolonged standing. R. 37-38.

Hale testified that she suffered from side effects from her medications, "I have an awful lot of nausea, I have lack of appetite, I have a lot of dizziness. I have oftentimes a lot of angina, I have pains that shoot through my arms or my chest, that's just part of my condition. Heartburn, I'd say that's about it." R. 34.

Hale testified that she drove a car. R. 41. She testified that she only drove to the store or doctor or to see her daughter or

grandson.  She testified she did not drive when she felt that she was not clear minded.  R. 43.

Hale testified that she could dress herself, feed herself, and take care of her personal hygiene.  R. 35.  Hale testified that she had problems with performing tasks requiring fine motor skills, such as buttoning buttons.  She testified that her fingers were numb and she had lost the sensitivity needed to perform these tasks.  R. 41.

Hale testified that she smoked about one-half pack of cigarettes a day.  She testified that she was trying to quit.  The ALJ made the following statement regarding Hale's smoking and her physical impairments:

> That seems to be the COPD, the emphysema, arterial sclerosis, and those are all exacerbated by smoking.  And you're here wanting me to be sympathetic with you for these horrible conditions you have, and you don't seem to be concerned.  Why should I care when you don't?

R. 35.

Hale testified that she previously worked as a legislative assistant and as a receptionist at a doctor's office.  She testified that she could not perform those jobs because of her inability to concentrate and because of her carpal tunnel syndrome.  The jobs

involved thinking quickly and routing calls accurately.  The jobs also involved typing and filing.  She testified that her carpal tunnel syndrome interfered with her ability to perform both of those activities.  R. 38-39.

Hale testified that she could not hold a gallon of milk in the mornings because of her carpal tunnel syndrome.  She testified that her hands were numb in the mornings.  She testified that the numbness went away during the day.  She testified that her hands and wrists ached with use during the day.  R. 39-40.

Hale testified that the side effects of her medications affected her every day.  She testified that her hands shook every morning because of her medications.  She testified, "It takes me until about noon to seem to get, get through my medication side effects and be normal."  R. 40.

Hale testified that on a typical day, she got up about 7:00 a.m. She testified that the morning was usually the "hardest time of the day."  She testified that she typically sat for a "couple of hours" and tried to eat toast and "just let the nausea and dizziness and everything pass."  R. 42.  Hale testified that she then washed a few

dishes, fed the dog, straightened up the living room, and then rested.  R. 42.

> Dr. Lanier then testified.  The ALJ asked Dr. Lanier:
>
> Now we're going to assume we have an individual the same age, education and experience as the claimant. This individual is limited to sedentary work, limited to occasional ramps, stairs, ladders and balancing with no ropes or scaffolds.  Needs to avoid concentrated exposure to extreme cold, extreme heat, dusts, odors, gases and fumes.  How would these restrictions affect the performance of claimant's past relevant work?

R. 52.  Dr. Lanier opined that such a person could perform Hale's past relevant work, except the dining room manager and the cashier.  R. 52-53.  Dr. Lanier opined that the individual would be terminated if she worked at "less than 80 percent productive on the job."  R. 53.  Hale's attorney examined Dr. Lanier.  The ALJ then concluded the hearing.  R. 62.

<u>THE DECISION OF THE ALJ</u>

On March 7, 2013, the ALJ issued his decision.  R. 11-19. The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b),

416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden on the last step; the Commissioner must show that,

considering the listed factors, the claimant can perform some type
of gainful employment that exists in the national economy.  20
C.F.R. §§ 404.1512, 404.1560(c); <u>Weatherbee v. Astrue</u>, 649 F.3d
565, 569 (7th Cir. 2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d
345, 352 (7th Cir. 2005).[8]

The ALJ found that Hale met her burden at Steps 1 and 2.
She had not engaged in substantial gainful activity since July 1,
2011, and she suffered from the severe impairments of peripheral
vascular (arterial) disease, and chronic pulmonary insufficiency.  R.
13.  At Step 3, the ALJ found Hale's impairments or combination of
impairments did not meet or medically equal any Listing.  R. 14.

At Step 4, the ALJ found that Hale had the RFC to perform
sedentary work except that she was limited to occasional climbing
or ramps, stairs and ladders, and balancing; and no climbing of
ropes or scaffolds.  The ALJ found that Hale also must avoid
concentrated exposure to extreme cold, extreme heat, dusts, odors,
gases, and fumes.  R. 15.  The ALJ reviewed the medical evidence
after July 2011.  R. 15-16.  The ALJ relied on the unremarkable

---

[8] Hales date last insured for DIB purposes will occur on December 31, 2015.  Therefore, the ALJ
considered whether Hale was disabled from the alleged onset date through the date of his decision.
R. 11.

results from the July 15, 2011, stress test.  R. 15.  The ALJ also
relied on Dr. Drake's examination notes in 2011 and 21012 that
stated Hale's blood pressure was well controlled and that Hale was
stable.  R. 16.

The ALJ rejected Dr. Drake's opinions because Dr. Drake
failed, "to build an adequate evidentiary bridge, which links his
opinions to reliable medical evidence; he has not identified any
evidence to demonstrate how the combination of physical
impairments prevents the claimant from working."  R. 16.  The ALJ
noted that, "Dr. Drake indicated that the claimant appeared to be
'pretty stable' at this point.  In addition, he also noted that overall,
everything appears better and that the claimant's blood pressure
[readings] outside the office are 'fairly' well controlled and they were
very good [in the office] today. R. 16.  The ALJ also found that Dr.
Drake's opinions were based on Hale's subjective reports rather
than medical findings, "Dr. Drake's opinions on the claimant's
ability to work are not given any weight as they are based on the
claimant's subjective statement and the claimant is not credible
regarding her degree of symptoms for the foregoing reasons."  R. 16.

The ALJ also found that Hale's testimony "that she is unable to sustain any full time work activities [was not] fully supported by the record." R. 17.  The ALJ cited the November 17, 2011, examination note from Dr. Drake which showed that Hale's lungs were clear and her heart rate was normal.  The ALJ then stated, "While diagnostic testing does reveal some significant findings, also noted above, these must correlate with clinical examination." R. 17. The ALJ noted that clinical findings did not support Hale's testimony of back pain.  The ALJ then concluded his credibility analysis:

> The undersigned also does not fully accept the claimant's allegations due to inconsistencies regarding the claimant's resultant limitations and her actual functioning.  Despite complaints of difficulty breathing secondary to chronic pulmonary insufficiency, a CT scan of the claimant's chest revealed indeterminate pulmonary nodules, coronary artery disease, ectasia of the ascending aorta without aneurysm, and centrilobular emphysema.

R. 17.

The ALJ also stated that he considered the opinions of the state agency physicians.  The ALJ stated that the RFC finding was different from the state agency finding because the ALJ considered evidence that was not considered by the state agency and because

the ALJ found that Hale was not credible.  R. 17-18.  The ALJ also stated that he considered the statement by Hale's former manager at Dollar General.  The ALJ found that the objective medical evidence did not support the manager's opinions.  R. 18.

The ALJ then determined at Step 4 that Hale could perform her past relevant work as a legislative assistant.  The ALJ relied on the RFC finding and Dr. Lanier's opinions to support this conclusion.  The ALJ concluded that Hale was not disabled. R. 18-19.  The ALJ did not reach Step 5 in the Analysis.

Hale appealed.  On March 18, 2014, the Appeals Council denied Hale's request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 1. Hale then brought this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the findings if they are supported by substantial evidence,

and may not substitute its judgment.  <u>Delgado v. Bowen</u>, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  <u>Elder v. Astrue</u>, 529 F.3d 408, 413-14 (7th Cir. 2008).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  <u>Herron v. Shalala</u>, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  <u>Clifford v. Apfel</u>, 227 F.3d 863, 872 (7th Cir. 2000).

In this case, the ALJ did not build an accurate and logical bridge from the evidence to his conclusions regarding Hale's credibility.  The Court does not understand the concluding part of the ALJ's credibility analysis.  The ALJ stated, "The undersigned also does not fully accept the claimant's allegations due to inconsistencies regarding the claimant's resultant limitations and her actual functioning."  R. 17.  The terms "resultant limitations" and her "actual functioning" both relate to functioning.  A "limitation" is a restriction, and a "resultant limitation" is a restriction on the ability to function as a result of impairments.  "Actual functioning" is how a person, in fact, functions.  The Court

does not understand how a person's resultant limitations can be inconsistent with actual functioning. If the evidence shows that Hale had resultant limitations, then her actual functioning would be restricted accordingly. The ALJ may have meant to say that Hale's testimony about her resultant limitations was inconsistent with her actual functioning. The ALJ, however, did not say that her testimony was inconsistent with actual functioning. The ALJ's statement is not clear.

The ALJ supported his statement about "resultant limitations" and "actual functioning" with the statement, "Despite complaints of difficulty breathing secondary to chronic pulmonary insufficiency, a CT scan of the claimant's chest revealed indeterminate pulmonary nodules, coronary artery disease, ectasia of the ascending aorta without aneurysm, and centrilobular emphysema." R. 17. The ALJ seems to be saying that Hale's complaints of difficulty breathing are inconsistent with the results of the CT scan. The CT scan, however, showed pulmonary nodules, coronary artery disease, and emphysema. R. 392-93. These three conditions seem consistent with symptoms of difficulty breathing, not inconsistent. The Court does not understand how these test results cast doubt on the

credibility of Hale's testimony about her breathing.[9]  Therefore, the ALJ failed to build an accurate and logical bridge from the evidence to his credibility finding.  The deficient credibility finding affected several aspects of the ALJ's decision, including his evaluation of medical opinions and his formulation of Hale's RFC.  <u>See</u> R. 15-18. The error requires reversal and remand.

On remand, the ALJ should also clarify another statement he made in his credibility analysis.  The ALJ stated, "While diagnostic testing does reveal some significant findings, also noted above, these must correlate with clinical examination."  R. 17.  This statement could mean that diagnostic test results cannot be considered in evaluating credibility unless the test results correlate with some finding in a clinical examination.  If so, the statement is legally wrong.  The ALJ should consider all the relevant, material evidence in the record when evaluating the credibility of testimony on the effect of pain on function, including the objective medical evidence.  <u>See</u> 20 C.F.R. §§ 404.1529(c)(2) and 416.929(c)(2); SSR 96-7p.  Objective medical evidence includes both diagnostic test

---

[9] The ALJ, himself, stated at the hearing that Hale's COPD, emphysema, and arterial sclerosis were "horrible conditions."  R. 35.  This observation would also seem consistent with Hale's testimony about her breathing difficulties and somewhat inconsistent with this portion of the ALJ's written decision.

results and signs shown by medically acceptable clinical diagnostic techniques.  20 C.F.R. §§ 404.1528 and 416.928.  The regulations do not require diagnostic test results to correlate with signs shown through diagnostic techniques.  Both types of objective medical evidence are relevant, and both types should be considered.  The ALJ's statement may mean that that he erroneously did not consider the diagnostic test results in making his credibility finding. On remand, the ALJ should clarify this matter.

The ALJ should also clarify his consideration of the opinions of state agency physicians.  R. 17-18.  The Court has been unable to find an opinion of a state agency physician in the record.  Dr. Gotanco affirmed the opinions in the September 14, 2011, RFC assessment on reconsideration.  R. 379-81.  The September 14, 2011, RFC assessment, however, is not in the record.  Dr. Gotanco made a reference to "light duty."  R. 381.  The ALJ may have been referring to this statement.  The ALJ should identify the state agency physician opinions which he considered.  The matter is unclear at this point.

## <u>CONCLUSION</u>

**THEREFORE Plaintiff Hale's Amended Motion for Summary Judgment (d/e 11), is ALLOWED; Defendant Commissioner of Social Security's Motion for Summary Affirmance (d/e 16) is DENIED; and the decision of the Commissioner should be REVERSED and REMANDED for further proceedings under sentence four of 42 U.S.C. § 405(g). Hale's original Motion for Summary Judgment (d/e 10) is denied as moot.**

**ENTER:  February 19, 2016**


        **<u>        s/ Sue E. Myerscough        </u>**
        **UNITED STATES DISTRICT JUDGE**